

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-15-00210-CV

IN THE INTEREST OF C. H. AND N. H., CHILDREN

No. 07-15-00212-CV

IN THE INTEREST OF R.N. AND Z.N., CHILDREN

On Appeal from the 320th District Court
Potter County, Texas
Trial Court Nos. 85,372-D, 84,863-D; Honorable Don R. Emerson, Presiding

September 11, 2015

## MEMORANDUM OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

T.N. is the mother of the four children involved in this matter. Her parental rights to the children were terminated by order of the trial court.[1] M.H. is the father of the children C.H. and N.H., and his parental rights to the children were terminated in the same trial.[2] Each parent appeals, asserting that the evidence was insufficient to

---

[1] Pursuant to Texas Rule of Appellate Procedure 9.8, we will refer to the parties and children by initials only.

[2] The cases were tried together before the trial court. T.N. is an appellant in each case, whereas M.H. is an appellant in No. 07-15-00212-CV only.

support the trial court's order terminating their respective parental rights.[3]  We will affirm.

Factual and Procedural Background.

The mother's involvement with the Texas Department of Family and Protective Services (the Department) began in October of 2013, when the Department received a report regarding physical neglect of R.N. and Z.N.  As a result of the report, an investigation commenced.  The Department's investigation revealed that the home the children were living in was filthy with cockroaches crawling around and animal feces on the floor.  The investigator, Mary Taylor, testified that before she entered the home the smell of the place was overpowering.  In describing the smell, Taylor used the term "toxic."  The children were found to be extremely dirty, and both were found to have head lice.  Z.N. was also found to have a large ringworm on the side of his head.  This initial investigation resulted in a safety placement of R.N. and Z.N. with a relative.  Around December of 2013, the relative informed the Department that she could no longer care for R.N. and Z.N., and the Department was appointed temporary managing conservator of R.N. and Z.N.  Taylor reported that she visited the home again about two weeks after R.N. and Z.N. were removed and there was very little improvement in the condition of the home.

C.H. and N.H. are twins born in January of 2014.  The twins are the children of T.N. and M. H. and were not removed from the home at birth because the parents had made "some progress" in addressing the housing issues that caused the removal of R.N

_____

[3] The father of R.N. and Z.N. was deceased prior to commencement of the Department's investigation.

and Z.N. However, the progress did not last. The caseworker for the Department, Brent Beasley, made an announced visit to the home in April of 2014 and discovered that the parents had reverted to their prior practices. Upon entering the apartment, he was met by a very strong odor of pet urine and fecal matter. The infant twins were dirty and grimy. One of the twins had a rather severe case of diaper rash and appeared to be wearing a diaper that was wet and had not been changed for a significant period of time. The infants had dirt and grime that had adhered to the folds of the skin around their neck and hands. C.H. and N.H. were removed from the home, and the Department was appointed temporary managing conservatorship of them. The twins were subsequently placed in foster care. After removal of the twins, when Beasley revisited the home, he found that it had "deteriorated drastically." After the twins were removed and placed in foster care, R.N. and Z.N. were placed in the same foster home.

Subsequently, the Department developed a service plan for T.N. and M.H. Each parent was provided a copy of the service plans. The trial court ordered the parents to comply with the Department's service plan and adopted the plans as the court's order. From the record, we learn that T.N. and M.H. completed a substantial part of the service plan.

During the bench trial on the Department's petition to terminate the parental rights of T.N. and M.H., a significant portion of the testimony dealt with the underlying problem of the parents' housing situation. The testimony revealed that, following the removal of the twins, T.N. and M.H. were evicted from their apartment. By October of 2014, T.N. and M.H. were living in their van. Additionally, the caseworker, Beasley, testified that T.N. and M.H. had informed him they were homeless for "probably three"

3

months. Eventually, approximately three weeks before trial, T.N. and M.H. moved into the apartment they occupied on the date of the trial. When Beasley visited the new apartment, he noticed that there was a strong odor of animal waste in the apartment. Further, he testified that there were lit candles throughout the apartment and the beds appeared to have "Carpet Fresh" sprinkled all over them. He found animal feces on the blankets of twin beds. Upon being questioned about this, T.N. stated they were pet-sitting for a friend's dog. She denied having any cats in the apartment; however, Beasley noticed a cat litter container in the apartment and that there was animal hair all over a comforter. Based upon the history of T.N. and M.H. with the Department, this caused great concern to Beasley.

Testifying for the Department, Edwin Basham, PhD, a psychologist, stated that he performed a psychological evaluation on both T.N. and M.H. that was required by the court-ordered service plan. In connection with T.N., Basham testified that she suffered from depression. It was his opinion that the depression lead to T.N.'s lack of ability to keep a home clean, sanitary, and functioning. Further, Basham recommended that T.N. see a physician to obtain a prescription for antidepressant medication. Basham opined that the failure of T.N. to seek such treatment would result in a poor prognosis for any sustained improvement. The record reflects that T.N. never followed up on Basham's recommendation to seek treatment.

Basham testified that the testing of M.H. revealed an IQ of 75, which would be in the fifth percentile of the population. This finding was important because it would affect M.H.'s ability to care for the children alone. In Basham's opinion, M.H.'s chronic unemployment is somewhat explained by the low IQ testing results. Further, Basham

4

testified that M.H. needs to be gainfully employed in order to avoid deterioration in his overall psychological condition.

When questioned about any concerns he might have about the ability of both parents to care for the children, Basham stated he had questions about their ability to maintain an adequate household on a consistent basis. He had serious doubts about their ability to properly supervise even one or two children who had no special needs. The record reflects that R.N. is receiving special education assistance at school and C.H. has significant lung and digestive issues. These facts were part of the concerns expressed by Basham regarding the abilities of the parents to properly supervise the children.

The foster father, Samuel Kelly, also testified regarding how the children are currently doing. He likewise testified that it was his and his wife's intent to try and adopt all four children. Kelly testified regarding C.H. and the medical problems he suffers from. Specifically, Kelly testified about C.H.'s underdeveloped lungs and the problems that this led to. Additionally, C.H. has to be fed through a feeding tube and, at the time of the trial, was still not able to eat solid food.

T.N. testified about her steps to successfully complete the court-ordered Department's service plan. She testified that she had completed all portions of the service plan except the requirement to attend the financial stability class. T.N. testified that she could not attend that class because, every time she tried to schedule the class, it was already in the middle of a session and she was required to start at the beginning of the sessions. On cross-examination, she simply said that she was unable to get in

touch with the class organizers because her phone had been disconnected or she had work conflicts.

As to the condition of her home, T.N. testified that she had changed and was keeping her home better cleaned and picked up. To prove this point, she offered a series of pictures showing her home. The pictures were taken after the caseworker visited the home.

M.H. testified about the prior problems surrounding the home. In essence, he offered a number of excuses for the reasons the home was always found in a dirty and cluttered manner. He offered testimony that he had poor parenting skills and just let the home go. He further opined that they had learned what they have to do because of their prior dealings with the Department.

At the conclusion of the testimony, the trial court terminated T.N.'s and M.H.'s parental rights. The trial court found by clear and convincing evidence that each parent had (1) knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being; (3) failed to comply with provisions of a court order that specifically established the actions necessary for the parents to obtain return of the children; and (4) that termination of their respective parental rights was in the best interest of the children.[4]

---

[4] *See* Act of May 19, 1997, 75th Leg., R.S., ch. 575 § 9, sec. 161.001(1)(D), (E), (O), (2), 1997 Gen. Tex. Laws 2012, 2015, amended by Act of Mar. 30, 2015, 84th Leg., R.S., S.B. 219, art. 1, § 1.078, sec. 161.001(b)(1)(D), (E), (O), (b)(2) (West 2015). The recent amendment renumbering section 161.001

T.N. and M.H. have each appealed the judgment of termination of their respective parental rights by a single issue. They each claim that the evidence is insufficient to support the trial court's termination of their rights. Disagreeing, we will affirm.

Standard of Review

The natural right existing between parents and their children is of constitutional dimensions. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). A decree terminating this natural right is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers between the parent and child except for the child's right to inherit. *Holick*, 685 S.W.2d at 20. That being so, we are required to strictly scrutinize termination proceedings. *In re G.M.,* 596 S.W.2d 846, 846 (Tex. 1980). However, parental rights are not absolute, and the emotional and physical interests of a child must not be sacrificed merely to preserve those rights. *In re C.H.,* 89 S.W.3d 17, 26 (Tex. 2002).

The Texas Family Code permits a court to terminate the parent-child relationship if the petitioner establishes both (1) one or more acts or omissions enumerated under section 161.001(b)(1), and (2) that termination of the parent-child relationship is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b) (West 2015).[5] Though evidence may be relevant to both elements, each element must be proved, and proof of

_____

of the Texas Family Code does not affect the resolution of the parent's appeal. We will refer to the renumbered sections of the code.

[5] Further reference to the Texas Family Code will be by reference to "section ____" or "§ ____."

one does not relieve the burden of proving the other. *See In re C.H.,* 89 S.W.3d at 28. While both a statutory ground and best interest of the child must be proved, only one statutory ground is required to terminate parental rights under section 161.001(b). *See In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003). Therefore, we will affirm the trial court's order of termination if legally and factually sufficient evidence supports any one of the grounds found in the termination order, provided the record shows that it was also in the best interest of the child for the parent's rights to be terminated. *See id.*

Due process requires the application of the clear and convincing standard of proof in cases involving involuntary termination of parental rights. *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002); *see* § 161.206(a) (West 2014). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007 (West 2014). This standard, which focuses on whether a reasonable jury could form a firm belief or conviction, retains the deference a reviewing court must have for the factfinder's role. *In re C.H.,* 89 S.W.3d at 26.

In reviewing the legal sufficiency of the evidence supporting an order terminating parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction as to the truth of the allegations sought to be established. *See In re J.F.C.,* 96 S.W.3d at 266. "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could

do so." *Id.* In other words, we will disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

When reviewing the factual sufficiency of the evidence supporting a termination order, we determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.,* 89 S.W.3d at 25. In conducting this review, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.,* 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

Analysis

Predicate Acts

Although the Department alleged a number of predicate acts it intended to prove to support termination of T.N.'s and M.H.'s parental rights, the trial court found that the Department had provided sufficient evidence to demonstrate that the parents had violated the requirements of three of the subdivisions of section 161.001(b)(1). Because proof of violation of one predicate act is sufficient to support an order of termination, we will initially concentrate on T.N.'s and M.H.'s compliance with the provisions of the trial court order. *See In re A.V.,* 113 S.W.3d at 362; *see also* § 161.001(b)(1)(O).

9

The testimony at trial proved that T.N. and M.H. completed many of the requirements in the court-ordered service plan. However, the record is equally clear that they did not complete the entire service plan. Specifically, they did not maintain stable housing, they did not provide the Department with any change of address within five days, they failed to attend the financial stability class, T.N. failed to follow the recommendations of the psychological evaluation, and M.H. failed to maintain stable and appropriate employment.

The caseworker, Beasley, testified that he had gone over the service plan with the parents. He then specifically referenced the reason for including the requirement of attendance at the financial stability class. Beasley stated that there were issues with money management in the home; in particular, at the time of his announced visit that prompted removal of the twins, the twins did not seem to have clothing nor was there appropriate food in the home. Therefore, it was the opinion of the Department that attendance at such a class would be helpful and beneficial to the parents. Both T.N. and M.H. testified that they did not attend the financial stability class.

In reference to the requirement to maintain stable housing, the record reflects that shortly after the twins were removed from the home they were evicted from their apartment. Then, for several months during the pendency of this matter, T.N. and M.H. were homeless. They admitted that during the pendency of the case they resided in their van for at least three months. The apartment they were residing in at the time of trial had been acquired only three weeks prior to trial commencing. During the period between removal of the twins in April 2014 and the trial date in April 2015, T.N. and M.H. had been able to acquire a suitable apartment only three weeks before trial.

Regarding the requirement to notify the Department of any change of address within five days, Beasley testified that T.N. and M.H. had stated that during part of the period between removal of the twins and the trial date, they were living with friends. Beasley further testified that T.N. and M.H. never advised him of the name of the friends nor did they advise the Department of the address of the friends. Essentially, for whatever period of time they lived with these friends, the Department was totally without the ability to conduct any home visit or contact them at their residence. During some of this same period, T.N. and M.H. were living in their van. Again, such an arrangement defeats the purpose of keeping the Department notified of any change of address.

As to T.N., she was ordered to participate in a psychological evaluation to be completed by Dr. Basham. She was further ordered to "follow any and all recommendations made by Dr. Basham." Basham testified that he recommended that T.N. seek a consult with a physician about antidepressant medication. T.N. testified that she did not seek a consult with a physician and never obtained antidepressant medication.

As to M.H., he was ordered to locate and maintain stable and appropriate employment. M.H. testified that, for most of the period of the investigation and pendency of this matter, he was unemployed. He had, by the time of trial, obtained a part time job doing maintenance type work at the apartment at which they were residing. The record reflected that T.N. and M.H. had resided in the apartment for only three weeks.

We have previously held that substantial compliance of a service plan does not equate to completion of the plan as required by the trial court's order. *See In re I.G.,* 383 S.W.3d 763, 771 (Tex. App.—Amarillo 2012, no pet.). Our review of the record in the light most favorable to the factfinder's verdict supports our conclusion that the evidence is legally sufficient. *See In re J.F.C.,* 96 S.W.3d at 266. Based upon our review of the entire record, we find that the "factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *See In re C.H.,* 89 S.W.3d at 25. Accordingly, the evidence is factually sufficient. Therefore, the trial court could have found by clear and convincing evidence that T.N. and M.H. failed to complete the family service plan ordered. *See id.* Because only one statutory ground is required to terminate parental rights under section 161.001(b), the evidence is sufficient to support the trial court's order of termination. *See In re A.V.,* 113 S.W.3d at 362.

Best Interest

Both T.N. and M.H. argue that the evidence is insufficient to support the trial court's determination that termination of their respective parental rights was in the best interest of the children. By way of analysis of the evidence regarding best interest, both parents simply state that the evidence does not demonstrate that termination of the parent-child relationship was in the best interest of the children. Accordingly, both contend that the trial court erred in determining that the Department had overcome the strong presumption that it is in the child's interest to preserve the parent-child relationship. *See Dupree v. Tex. Dep't of Prot. & Reg. Servs.,* 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no pet.). Such is the sum and total of the argument presented by both parents in regards to the best interest issue.

In this instance, we must agree with the Department that T.N. and M.H. have failed to properly address the issues regarding the best interest requirement of the statute. Rule 38.1(i) of the Texas Rules of Appellate Procedure requires that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record. TEX. R. APP. P. 38.1(i); *In re L.K.,* No. 12-11-00169-CV, 2012 Tex. App. LEXIS 10569, at *8 (Tex. App.—Tyler Dec. 20, 2012, pet. denied) (mem. op.). T.N. and M.H. have each provided this Court with no argument, other than a conclusion, nor have they provided any analysis of the facts of the case. Under these circumstances, the point is not properly briefed and is waived. *In re K.C.B.,* 280 S.W.3d 888, 896 (Tex. App.—Amarillo 2009, pet. denied). Accordingly, that portion of the judgment is affirmed.

Conclusion

Having overruled T.N.'s and M.H.'s challenges to the legal and factual sufficiency of the evidence, and having found that they did not properly brief the issue regarding the best interest of the children, we affirm the judgment of the trial court.

Mackey K. Hancock
Justice

Pirtle, J., concurring in result.

13